UNITED STATES COURTS
SOUTHERN DISTRICT OF TEXAS
FILED

CIVIL ACTION NO. 4:06-CV-00347

MAR 0 2 2006

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS    MICHAEL N. MILBY, CLERK OF COURT
HOUSTON DIVISION

TEXAS A&M UNIVERSITY,

*Plaintiff*,

v.

SEATTLE SEAHAWKS, INC., SEATTLE PROFESSIONAL FOOTBALL, INC. and
FOOTBALL NORTHWEST, LLC,

*Defendants*.

---

## MEMORANDUM IN SUPPORT OF SEAHAWKS' MOTION TO TRANSFER VENUE

---

J. Michael Bell
Federal Admission No. 5574
State Bar No. 02079200

ATTORNEY-IN CHARGE FOR DEFENDANT
FOOTBALL NORTHWEST LLC

OF COUNSEL:

**THOMPSON & KNIGHT LLP**

Jill W. Young
State Bar No. 00797670
333 Clay Street, Suite 3300
Houston, Texas 77002-4499
713-654-8111 – Telephone

**FOSTER PEPPER PLLC**

Tim J. Filer
Jeffrey S. Miller
1111 Third Ave., Suite 3400
Seattle, Washington 98101
206-447-4400 – Telephone

# TABLE OF CONTENTS

I.    INTRODUCTION AND SUMMARY OF THE ARGUMENT ........................................ 1

II.   STATEMENT OF THE NATURE AND STAGE OF THIS PROCEEDING................... 2

    A.    TAMU Filed Suit and Obtained a TRO Without Notice to the Seahawks. ............ 2
    B.    The Witnesses and Evidence Concerning the Seahawks' Use of "Twelfth
        Man" is Located in Washington. ....................................................................... 3
    C.    The Witnesses and Evidence of Third Parties' Use of the Phrase "Twelfth
        Man" Relating to the Seahawks is Largely in Washington. ................................. 3

III.  ARGUMENT AND AUTHORITIES.................................................................................. 5

    A.    Legal Standard for a Transfer of Venue ............................................................ 5
    B.    The Western District of Washington is Undoubtedly a Proper Venue. ................. 6
    C.    The "Private" Factors Overwhelmingly Favor Transfer. ........................................ 7

        1.    Transferring this Case to Seattle Will Offer Easier Access to
            Sources of Proof in the "Place of the Alleged Wrong." ............................. 7
        2.    With a Seattle Venue, the Parties Can Compel Necessary Third-
            Party Defense Witnesses to Testify In Person at Trial. .............................. 9
        3.    A Transfer Will Greatly Reduce Trial Expenses. ...................................... 10

    D.    The "Public" Factors Also Favor Transfer. ......................................................... 10

        1.    The Residents of Western Washington Have a Strong Interest in
            Resolving the Dispute Concerning this Alleged Infringement
            Occurring in Their District......................................................................... 10
        2.    The Transferee Court is Familiar with Federal Trademark Law and
            Can Capably Construe Texas Law............................................................ 11
        3.    Court Congestion is Not a Factor............................................................. 11
        4.    This Case Does Not Present Any Concerns Related to Conflict of
            Laws.......................................................................................................... 11
        5.    Transfer Will Not Cause Delay................................................................. 12

IV.   CONCLUSION................................................................................................................. 12

# Cases

*Action Indus., Inc. v. U.S. Fid. & Guar. Co.,*
  358 F.3d 337 (5th Cir. 2004) ..................................................................... 11

*Anadigics, Inc. v. Raytheon Co.,*
  903 F. Supp. 615 (S.D.N.Y. 1995) ............................................................. 7

*Balawajder v. Scott,*
  160 F.3d 1066 (5th Cir. 1998) ................................................................... 5

*Caldwell v. Palmetto State Sav. Bank,*
  811 F.2d 916 (5th Cir. 1987) ..................................................................... 5

*Chem. Specialties, Inc. v. Osmose, Inc.,*
  No. Civ. A. H-05-3813, 2006 WL 237014 (S.D. Tex. Jan. 30, 2006) ................ 7, 9

*Habitat Wallpaper and Blinds, Inc. v. K.T. Scott Ltd. P'ship,*
  807 F. Supp. 470 (1992) ............................................................................ 7

*Houston Trial Reports, Inc. v. LRP Publ'ns, Inc.,*
  85 F. Supp. 2d 663 (S.D. Tex. 1999) ........................................... 6, 8, 9, 10

*In re Horseshoe Entm't,*
  337 F.3d 429 (5th Cir. 2003) ..................................................................... 5

*In re Volkswagen AG,*
  371 F.3d 201 (5th Cir. 2004) ......................................................... 5, 6, 9, 10

*LeBouef v. Gulf Operators, Inc.,*
  20 F. Supp. 2d 1057 (S.D. Tex. 1998) ....................................................... 9

*Piper Aircraft Co. v. Reyno,*
  454 U.S. 235 (1981) ................................................................................ 10

*Republic Capital Dev. Group, L.L.C. v. A.G. Dev. Group, Inc.,*
  No. Civ. A. H-05-1714, 2005 WL 3465728 (S.D. Tex. Dec. 19, 2005) .......... 5, 9, 12

*Spiegelberg v. Collegiate Licensing Co.,*
  402 F. Supp. 2d 786 (S.D. Tex. 2005) .......................................... 6, 7, 8, 9, 10, 11

*State Street Capital Corp. v. Dente,*
  855 F. Supp. 192 (S.D. Tex. 1994) ............................................................ 9

## Statutes & Administrative Codes

15 U.S.C. § 1051 ................................................................................................ 6

28 U.S.C. § 1331 ................................................................................................ 6

28 U.S.C. § 1332(a)(1) ...................................................................................... 6

28 U.S.C. § 1338 ................................................................................................ 6

28 U.S.C. § 1391(a)(1) ...................................................................................... 6

28 U.S.C. § 1391(a)(2) ...................................................................................... 6

28 U.S.C. § 1404(a) ............................................................................... 1, 5, 9, 12

## Other

Fed. R. Civ. P. 45(c)(3) ...................................................................................... 9

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| TEXAS A&M UNIVERSITY, | § | |
| | § | |
| Plaintiff, | § | Civil Action No. 4:06-CV-00347 |
| | § | |
| vs. | § | |
| | § | |
| SEATTLE SEAHAWKS, INC., | § | |
| SEATTLE PROFESSIONAL | § | |
| FOOTBALL, INC. and FOOTBALL | § | |
| NORTHWEST, LLC, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM IN SUPPORT OF SEAHAWKS' MOTION TO TRANSFER VENUE**

Defendant Football Northwest LLC d/b/a Seattle Seahawks ("FNW" or the "Seahawks")

respectfully submits this memorandum supporting its motion under 28 U.S.C. § 1404(a) to

transfer the venue of this case to the United States District Court for the Western District of

Washington.

## I.    INTRODUCTION AND SUMMARY OF THE ARGUMENT

For more than 20 years, the Seattle Seahawks have used the phrase "twelfth man" as a

complimentary pseudonym for their fans, especially those who attend Seahawks home football

games in Seattle, Washington. Plaintiff Texas A&M University's ("TAMU") suit revolves

around use of the phrase "twelfth man" by the Seahawks.

There is no question that virtually all the "infringement" activity described in the

Complaint took place in the Seattle metropolitan area. The witnesses with knowledge of those

facts, the Seahawks, third parties, along with any potential trademark survey witnesses, are

overwhelmingly located in Washington. Under § 1404(a) as applied to trademark cases,

transferring venue is appropriate because moving the case to Washington will, without prejudice

to TAMU, (a) significantly increase the convenience for numerous third-party witnesses who reside in the Seattle area and therefore cannot be compelled to testify in Houston and (b) allow this case to be resolved in the district where the alleged "infringement" purportedly occurred. Accordingly, the Seahawks request that the Court exercise its discretion to grant this motion and transfer this case to the United States District Court for the Western District of Washington.

## II.    STATEMENT OF THE NATURE AND STAGE OF THIS PROCEEDING

### A.    TAMU Filed Suit and Obtained a TRO Without Notice to the Seahawks.

Starting in late 2004, TAMU and the Seahawks exchanged correspondence about the Seahawks' use of the phrase "12th Man" in stadium signage located inside their home stadium – Qwest Field in Seattle – in game day programs distributed at home games, and other localized uses. Affidavit of John Rizzardini ("Rizzardini Affidavit") at ¶ 5. The last communication that the Seahawks received from TAMU on this topic was on October 27, 2005. *Id.*

Only days before the Seahawks played in Super Bowl XL, TAMU filed suit in Brazos County, Texas, and obtained an *ex parte* TRO. *See* Affidavit of J. Michael Bell ("Bell Affidavit"), **Exhibit A** (copy of TAMU's Petition, Jury Demand and Application for Temporary Restraining Order and Temporary and Permanent Injunctions filed in the District Court of Brazos County, Texas, on January 30, 2006). TAMU gave the Seahawks no warning before it sued the Seahawks and obtained an *ex parte* TRO.[1] Bell Affidavit at ¶ 4.

Defendants timely removed this case to this Court by a Notice of Removal filed on February 2. [Dkt. 1.] TAMU has refused to stipulate to a venue transfer. Bell Affidavit at ¶ 3.

---

[1] At TAMU's request, the Seahawks have agreed to extend the TRO three times to facilitate discussions concerning the possibility of an agreed temporary injunction and to accommodate TAMU's counsel's change of firm. Bell Dec. at ¶ 4. These extensions have been without waiver of any of the Seahawks' objections to the issuance or scope of the TRO. *Id.*

**B.    The Witnesses and Evidence Concerning the Seahawks' Use of "Twelfth Man" is Located in Washington.**

The Seahawks maintain their books, records, and other property at their offices in Seattle and Kirkland, Washington. Rizzardini Affidavit at ¶ 3. The Seahawks play their home games at Qwest Field in Seattle. *Id.* All the third parties—ranging from media companies to financial institutions to food vendors—that have run promotions incorporating the phrase "twelfth man" and the numeral 12 are located in the Seattle area. Rizzardini Affidavit at ¶ 6.

In its complaint, Plaintiff asserts claims for trademark infringement and dilution under federal and Texas law. *See* Bell Affidavit, **Exhibit A**. Plaintiff alleges that Defendants violated Plaintiff's trademark rights in the terms "12th MAN" and "12th MANIA." *Id.* Specifically, Plaintiff alleges that Defendants have used the term "12th MAN" in Seahawks advertisements, on the Seahawks Web site, and on merchandise. *Id.* at ¶ 24. In addition, Plaintiff alleges that Defendants used the "12th MAN" mark during home football games at Qwest Field on towels and buttons distributed to fans. *Id.* at ¶ 25. Plaintiff also complains about the use of a flag bearing the number 12 at Qwest Field just before kickoffs and about the raising of such flags on office buildings in the Seattle area. These allegations apparently relate exclusively to acts of "infringement" that took place in the Seattle area.[2]

**C.    The Witnesses and Evidence of Third Parties' Use of the Phrase "Twelfth Man" Relating to the Seahawks is Largely in Washington.**

The Seahawks promote their football games—and the franchise generally—in conjunction with numerous local businesses, ranging from food and beverage vendors to media

---

[2] Many of the allegations attributing use of the phrase "12th Man" to the Seahawks are inaccurate and appear to be based upon an insufficient investigation of the facts as TAMU was rushing to the courthouse. The Seahawks will contest these allegations at the appropriate time. For purposes of this motion, however, the allegations simply reinforce the fact that the case is focused on conduct that occurred in Washington, and that the key facts and percipient witnesses are located there.

affiliates to large financial institutions. Some of these entities have used the term "twelfth man" in promoting the team along with their own products and services. Rizzardini Affidavit at ¶ 6.

For example, one of the most important and longest-running relationships involves KIRO, a radio station that broadcasts from Seattle. Rizzardini Affidavit at ¶ 7. KIRO has frequently used the phrase "twelfth man" in various Puget Sound-area promotions, marketing efforts, and by its on-air personnel during broadcasts. *Id.* Several other sponsors, such as Oberto Sausage Company and the Ram Restaurant & Brewery, have also used the term "twelfth man" in Pacific Northwest-based promotions and advertising. *Id.*

Many other third parties, such as KJR Radio, have used the phrase "twelfth man" and the number 12 as a complimentary pseudonym for Seahawks fans in promotions, conversations, and marketing activities. Rizzardini Affidavit at ¶ 8. The Seahawks cannot and do not control these third parties. *Id.* To the extent that these Pacific Northwest-based parties have manufactured, marketed, and sold products over an extended period of time that may infringe upon Plaintiff's trademarks (or their conduct is alleged to implicate the Seahawks somehow), their testimony may prove to be very relevant at trial.

The accompanying Affidavit of Jeffrey S. Miller ("Miller Affidavit") lists third parties (totaling more than 50 individuals and entities) who the Seahawks believe may offer testimony concerning "twelfth man" references to and by Seahawks fans. These third parties generally comprise three categories of witnesses who might offer "twelfth man"-related testimony in discovery and at trial, including (i) local media companies; (ii) local businesses which have used the phrase "12th Man;" and (iii) owners and managers of buildings in the Seattle area where "12" flags have flown.

### III.    ARGUMENT AND AUTHORITIES

**A.    Legal Standard for a Transfer of Venue**

Under 28 U.S.C. § 1404(a), "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district . . . where it might have been brought." A district court has "broad discretion" in deciding whether to transfer venue. *Balawajder v. Scott*, 160 F.3d 1066, 1067 (5th Cir. 1998) (quoting *Caldwell v. Palmetto State Sav. Bank*, 811 F.2d 916, 919 (5th Cir. 1987)). That said, the standards guiding this inquiry are well-developed. As Judge Lake very recently commented, "the purpose of [§1404(a)] is to avoid wasted time, energy, and money while at the same time protecting litigants, witnesses, and the public against unnecessary inconvenience and expense." *Republic Capital Dev. Group, L.L.C. v. A.G. Dev. Group, Inc.*, No. Civ. A. H-05-1714, 2005 WL 3465728, at *8 (S.D. Tex. Dec. 19, 2005).

After the court concludes that the transferee court would have had jurisdiction of the suit to be transferred, then the court weighs various "private" and "public" interests to determine whether, on balance, a transfer is warranted. *In re Volkswagen AG*, 371 F.3d 201, 203 (5th Cir. 2004). As enumerated by the court in *Volkswagen*,

> The private concerns include: (1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious and inexpensive. The public concerns include: (1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws of the application of foreign law.

371 F.3d at 203 (citations omitted). An additional factor is "plaintiff's choice of forum," but "it is neither conclusive nor determinative." *In re Horseshoe Entm't*, 337 F.3d 429, 434 (5th Cir. 2003). In intellectual property cases, courts in this district and elsewhere have held that the

"infringer's principal place of business is often the critical and controlling consideration in adjudicating transfer of venue motions." *Spiegelberg v. Collegiate Licensing Co.*, 402 F. Supp. 2d 786, 792 (S.D. Tex. 2005) (quoting *Houston Trial Reports, Inc. v. LRP Publ'ns, Inc.*, 85 F. Supp. 2d 663, 668 (S.D. Tex. 1999) (internal quotations omitted and emphasis added).

**B.      The Western District of Washington is Undoubtedly a Proper Venue.**

As a threshold matter, a court must determine whether the suit to be transferred could have been filed in the proposed transferee court. *Volkswagen*, 371 F.3d at 203. Without question, the district court for the Western District of Washington would have had subject matter jurisdiction of this case and personal jurisdiction over the Seahawks had Plaintiff filed suit there in the first place. Plaintiff has asserted trademark claims under the Lanham Act, 15 U.S.C. § 1051 *et seq.* The transferee court and this court both have subject matter jurisdiction of these federal claims. 28 U.S.C. §§ 1331, 1338(a). And, because Defendants and TAMU reside in different states, there is a diversity of citizenship. 28 U.S.C. § 1332(a)(1). In addition, the transferee court would have had personal jurisdiction over defendants, because FNW resides in Washington, as did the other two defendants while they were active legal entities.

Furthermore, the Western District of Washington is a proper venue. First, "all defendants" reside in Washington. 28 U.S.C. § 1391(a)(1). *See* Rizzardini Affidavit at ¶¶ 3, 4. Second, a "substantial part of the events or omissions" alleged in Plaintiff's petition occurred in Washington. 28 U.S.C. 1391(a)(2). Plaintiff's petition revolves around alleged acts of "infringement" **in Washington**—for example, raising a flag atop the Seattle Space Needle, and handing out towels, buttons, and similar promotional items during football games played in Seattle. Therefore, the Western District of Washington qualifies as a proper venue under either section 1391(a)(1) or (2).

C.    **The "Private" Factors Overwhelmingly Favor Transfer.**

Here, the "private" convenience factors decisively favor transfer. Accepting all the facts

outlined in Plaintiff's petition as true, for purposes of this motion only, the only connection this

case has with the Southern District of Texas is Plaintiff's residence here. In contrast, the

Western District of Washington is home to the Seahawks and all material defense witnesses,

including many third parties, as well as the location of relevant documents. Further, the alleged

acts of infringement are claimed to have occurred in that district. For all these reasons, a transfer

would greatly enhance the convenience to the parties, witnesses, and sources of proof, and

Plaintiff's choice of forum carries very little weight.

1.    **Transferring this Case to Seattle Will Offer Easier Access to Sources of Proof in the "Place of the Alleged Wrong."**

The "place of the alleged wrong" is "important" in this multi-factored analysis.

*Spiegelberg*, 402 F. Supp. 2d at 791; *Chem. Specialties, Inc. v. Osmose, Inc.*, No. Civ. A. H-05-

3813, 2006 WL 237014, at *4 (S.D. Tex. Jan. 30, 2006). One court referred to the district where

the alleged infringement occurred as the "center of gravity" for the plaintiff's infringement

claim. *Anadigics, Inc. v. Raytheon Co.*, 903 F. Supp. 615, 618 (S.D.N.Y. 1995) (collecting

cases). Another court summed up the reasons for transferring an infringement case as follows:

> Virtually all the acts which would constitute the alleged infringement . . . took place in
> Massachusetts . . . . Additionally, numerous third-party witnesses required by K.T. Scott
> for its defense . . . are located in the Boston area. Furthermore, the injunctive relief
> sought by Habitat, if granted, would require enforcement in Massachusetts. Transferring
> venue to Massachusetts . . . would afford convenience to the defendants, their witnesses,
> and the court, without causing undue burden to Habitat.

*Habitat Wallpaper and Blinds, Inc. v. K.T. Scott Ltd. P'ship*, 807 F. Supp. 470, 475 (1992).

Courts in this district have cited to both *Anadigics* and *Habitat* to support their reasoning that

infringement cases should be transferred to the home of the "infringer" and the place of

infringement. *See Spiegelberg*, 402 F. Supp. 2d at 792; *Houston Trial Reports*, 85 F. Supp. 2d at 668.

Plaintiff seeks damages and injunctive relief to remedy alleged trademark infringement and dilution by the Seahawks. In short, Plaintiff alleges (i) that it holds federal trademark registrations for the marks "12th MAN" and "12th MANIA" and Texas common-law trademark rights to these marks and (ii) that the Seahawks have infringed upon these marks in its business operations as the owner of the Seattle Seahawks NFL franchise.

Plaintiff's specific allegations of infringement focus on team promotional activities in and around Seattle, Washington. For example, Plaintiff's petition highlights the Seahawks' "display" of "infringing flags" atop the Seattle Space Needle. Bell Affidavit, **Exhibit A** at ¶ 4. Similarly, Plaintiff alleges that "the Seattle Seahawks distributed '12th Man' towels" at recent Seahawks football games. *Id.* at ¶ 25. Aside from alleged uses of "12th MAN" marks on the Seahawks Web site and some media remarks that were carried outside of Washington, all the "infringement" described in Plaintiff's petition appears to have occurred in Washington. In any event, Plaintiff has not alleged that the Seahawks or any other defendant "infringed" in Texas.

Although the Seahawks have not yet identified all the documents, files, and other evidence that might be relevant to its defenses here, the sources of proof that have been identified are all located in the Seattle area. Plaintiff's evidence necessary to prove trademark registration and use is comparatively simple to collect and likely less voluminous than the Seahawks' evidence. And Plaintiff's allegations of infringement focus on the Seahawks' actions in and around Seattle. Moreover, as detailed above, dozens of third-party witnesses likely reside in the Seattle area. Under the reasoning of *Spiegelberg* and *Houston Trial Reports* and the cases

cited therein, the Seahawks' domicile in Washington, which is also the alleged "place of infringement," appears to be the decisive factor favoring transfer.

>    **2.      With a Seattle Venue, the Parties Can Compel Necessary Third-Party Defense Witnesses to Testify In Person at Trial.**

Another highly significant factor is convenience to witnesses. *Houston Trial Reports*, 85 F. Supp. 2d at 668 (quoting *LeBouef v. Gulf Operators, Inc.*, 20 F. Supp. 2d 1057, 1060 (S.D. Tex. 1998)). *See also Spiegelberg*, 402 F. Supp. 2d at 790 ("The relative convenience to the witnesses is often recognized as the most important factor under § 1404(a)."). Specifically, convenience to non-party witnesses receives greater weight in the analysis. *Chem. Specialties*, 2006 WL 237014, at *3 (quoting *State Street Capital Corp. v. Dente*, 855 F. Supp. 192, 198 (S.D. Tex. 1994)).

Because the Seahawks have identified dozens of potential third-party witnesses whose testimony could not be compelled in Houston, this factor heavily weighs in favor of transfer. *See Volkswagen*, 371 F.3d at 204-05 ("When the distance between an existing venue for trial of a matter and a proposed venue under § 1404(a) is more than 100 miles, the factor of inconvenience to witnesses increases in direct relationship to the additional distance to be traveled. Additional distance means additional travel time; additional travel time increases the probability for meal and lodging expenses; and additional travel time with overnight stays increases the time which these fact witnesses must be away from their employment."). *See also Republic Capital*, 2005 WL 3465728, at *9 (noting that defendant / movant had identified many non-party witnesses who resided in the transferee district and whose testimony at trial could not be compelled under Fed. R. Civ. P. 45(c)(3)).

**3.    A Transfer Will Greatly Reduce Trial Expenses.**

Witnesses and third parties testifying on the Seahawks' behalf will incur far less expense testifying at trial in Seattle than in Houston. Because the Seahawks' witnesses will likely outnumber Plaintiff's, these cost savings will be substantial. This factor clearly weighs in favor of transfer. *See Houston Trial Reports*, 402 F. Supp. 2d at 791.

**D.    The "Public" Factors Also Favor Transfer.**

**1.    The Residents of Western Washington Have a Strong Interest in Resolving the Dispute Concerning this Alleged Infringement Occurring in Their District.**

The Seahawks could not be more firmly rooted in the Seattle area. Football Northwest is a Washington corporation. The Seahawks play their football games at Qwest Field in downtown Seattle. They conduct their pre-season camp in a small college town in Washington, and during the season they train in Kirkland, Washington. Rizzardini Affidavit at ¶ 3. The Seahawks' headquarters, executive offices, and principal place of business are also in Kirkland.

Strong local interest in Seattle favors transfer. In a similar case recently filed in this district, where Texas Tech's trademarks were at issue, Judge Atlas reasoned that the residents of Lubbock had a "strong interest" in the case, because the alleged infringement occurred "in Lubbock." *Spiegelberg*, 402 F. Supp. 2d at 793. There, the court ordered a transfer to the Northern District of Texas. *Id.* Likewise, the residents of the Seattle area have a strong interest in resolving this dispute involving the Seahawks, where the alleged infringement appears to have occurred at games and other fan-oriented events attended by tens of thousands of local fans in Washington.

In sum, the "local interest in having localized interests decided at home" weighs "heavily" in favor of transfer to Seattle. *Volkswagen*, 371 F.3d at 206 (quoting *Piper Aircraft*

*Co. v. Reyno*, 454 U.S. 235, 241 n.6 (1981)) (issuing writ of mandamus to district court to order transfer to the Western District of Texas, where automobile accident at issue had occurred).

**2.      The Transferee Court is Familiar with Federal Trademark Law and Can Capably Construe Texas Law.**

This case involves federal trademark law. Because this Court and the transferee court are both federal district courts, "familiarity" with federal law is not a factor here. *Spiegelberg*, 402 F. Supp. 2d at 792.

Plaintiff's claims under Texas trademark law likewise will not present difficulties in the transferee court. Like any other federal district court, the transferee court routinely decides cases under the laws of states other than Washington. Unless Plaintiff shows that the transferee court is "unable or unwilling" to apply Texas law, this factor is neutral in the transfer analysis. *See Action Indus., Inc. v. U.S. Fid. & Guar. Co.*, 358 F.3d 337, 340 (5th Cir. 2004).

**3.      Court Congestion is Not a Factor.**

The Western District of Washington and the Southern District of Texas have substantially similar disposition rates. According to statistics published at www.uscourts.gov, the median time from filing to disposition in civil cases in the Western District of Washington in 2005 was 9.6 months. Bell Affidavit, **Exhibit B** ("Judicial Caseload Profile" for W.D. Wash.). For its part, the Southern District of Texas posted a 9.8-month disposition rate in 2005. *Id.* ("Judicial Caseload Profile" for S.D. Tex.). Thus this factor is neutral in the transfer analysis.

**4.      This Case Does Not Present Any Concerns Related to Conflict of Laws.**

The Seahawks have not identified any conflict of laws here, which makes this factor neutral in the transfer analysis. *Spiegelberg*, 402 F. Supp. 2d at 792.

**5.      Transfer Will Not Cause Delay.**

Although every transfer causes some delay, this is not a concern here. This case was removed to this court within the last month. Since removal, no case activity has occurred, and the parties have worked cooperatively on scheduling issues. Therefore, the transferee court will not receive a "voluminous record that would require a large time investment" that might potentially delay resolution of the case. *See Republic Capital*, 2005 WL 3465728, at *10 (ignoring "delay" as a factor in the transfer analysis where case had been pending for only six months). This is a neutral factor in the transfer analysis.

## IV.    CONCLUSION

Transferring venue to the Western District of Washington will promote the convenience of the witnesses and parties and best serve the interests of justice. Plaintiff's allegations of "infringement" by the Seahawks and the other defendants focus on actions occurring in the Seattle area, where the Seahawks play and Football Northwest is incorporated. Under the well-developed factors used to determine whether transfer is proper under 28 U.S.C. § 1404(a) in intellectual property cases, the "place of infringement" is most heavily weighted. Transferring venue will enable Defendants to effectively present third-party witness testimony—if this case proceeds in this Court, the parties cannot compel those necessary witnesses to testify. For all these reasons, the Seahawks respectfully request that the Court order a transfer.

DATED this 2nd day of March, 2006.

Respectfully submitted,

_____
J. Michael Bell
Federal Admission No. 5574
State Bar No. 02079200
333 Clay Street, Suite 3300
Houston, Texas 77002-4499
713-654-8111 – Telephone
713-654-1871 – Facsimile

ATTORNEY-IN CHARGE FOR DEFENDANT
FOOTBALL NORTHWEST LLC

OF COUNSEL:
Jill W. Young
State Bar No. 00797670
THOMPSON & KNIGHT LLP
333 Clay Street, Suite 3300
Houston, Texas 77002-4499
713-654-8111 – Telephone
713-654-1871 – Facsimile

Tim J. Filer
Jeffrey S. Miller
FOSTER PEPPER PLLC
1111 Third Ave., Suite 3400
Seattle, Washington 98101
206-447-4400 – Telephone

CERTIFICATE OF SERVICE

I certify that on this 2nd day of March, 2006, a true and correct copy of the above and foregoing instrument was served on all counsel of record herein, as follows, in accordance with the *Federal Rules of Civil Procedure*:

  Sanford E. Warren, Jr.
  R. Scott Rhoades
  Akin Gump Strauss Hauer & Feld LLP
  1700 Pacific Avenue, Suite 4100
  Dallas, Texas 75201-4675

  Bill Youngkin
  P.O. Box 4806
  Bryan, TX 77805

  _____
  J. Michael Bell

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| TEXAS A&M UNIVERSITY, | § |
| | § |
| Plaintiff, | §    Civil Action No. 4:06-CV-00347 |
| | § |
| vs. | §    AFFIDAVIT OF JOHN RIZZARDINI |
| | § |
| SEATTLE SEAHAWKS, INC., | § |
| SEATTLE PROFESSIONAL | § |
| FOOTBALL, INC. and FOOTBALL | § |
| NORTHWEST, LLC, | § |
| | § |
| Defendants | § |

STATE OF WASHINGTON    )
                       ) ss.
COUNTY OF KING         )

John Rizzardini being first duly sworn on oath, deposes and says:

1.      My name is John Rizzardini.  I am over the age of 18, not a party to this action, and competent to testify in this matter.

2.      I am Vice President/Marketing/Customer Sales & Service for Football Northwest LLC d/b/a Seattle Seahawks, a position I have held since August, 2003.  I oversee ticket and suite sales, advertising and branding, retail operations, and customer service for the Seahawks.

3.      Football Northwest LLC is a Washington corporation with its principal place of business in Kirkland, Washington, a Seattle suburb.  The Seahawks also have offices at Qwest Field, where the Seahawks play their home games, and the team practices in Eastern Washington and in Kirkland.  The Seahawks maintain their books, records, and other property at their offices in Seattle and Kirkland, Washington.

50650420.1

4.      Defendants Seattle Seahawks, Inc. and Seattle Professional Football, Inc. were entities used during previous ownership of the Seahawks franchise, and I understand that these entities are now defunct.

5.      Starting in late 2004, TAMU and the Seahawks exchanged correspondence about the Seahawks' use of the phrase "12th Man" in stadium signage located inside their home stadium – Qwest Field in Seattle – in game day programs distributed at home games, and other localized uses. The last communication that the Seahawks received from TAMU on this topic was on October 27, 2005.

6.      The Seahawks promote their football games—and the franchise generally—in conjunction with numerous local businesses, ranging from food and beverage vendors to media affiliates to large financial institutions. Some of these entities have used the term "twelfth man" in promoting the team along with their own products and services. All the third parties—ranging from media companies to financial institutions to food vendors—that have run promotions incorporating the phrase "twelfth man" and the numeral 12 are located in the Seattle area.

7.      One of the Seahawks' most important and longest-running relationships involves KIRO, a radio station that broadcasts from Seattle. KIRO has frequently used the phrase "twelfth man" in various Puget Sound-area promotions, marketing efforts, and by its on-air personnel during broadcasts. Several other sponsors, such as Oberto Sausage Company and the Ram Restaurant & Brewery, have also used the term "twelfth man" in Pacific Northwest-based promotions and advertising.

506354420.1

8.      Many other third parties, such as KJR Radio, have used the phrase "twelfth man" and the number 12 as a complimentary pseudonym for Seahawks fans in promotions, conversations, and marketing activities. The Seahawks cannot and do not control these third parties.

_John Rizzardini_

John Rizzardini

SUBSCRIBED AND SWORN to before me this 2 day of March 2006.

_Kristina M Howell_
(Signature of Notary)

Kristina M. Howell
Notary public in and for the State of
Washington, residing at Issaquah, WA
My appointment expires 3/19/06

50636420.1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| TEXAS A&M UNIVERSITY, | § | |
| | § | |
| Plaintiff, | § | Civil Action No. 4:06-CV-00347 |
| | § | |
| vs. | § | |
| | § | |
| SEATTLE SEAHAWKS, INC., | § | |
| SEATTLE PROFESSIONAL | § | |
| FOOTBALL, INC. and FOOTBALL | § | |
| NORTHWEST, LLC, | § | |
| | § | |
| Defendants. | § | |

## AFFIDAVIT OF J. MICHAEL BELL

| | |
|---|---|
| STATE OF TEXAS | ) |
| | ) ss. |
| COUNTY OF HARRIS | ) |

J. Michael Bell being first duly sworn on oath, deposes and says:

1.      My name is J. Michael Bell.  I am over the age of 18, not a party to this action, and competent to testify in this matter.

2.      I am a partner with the law firm of Thompson & Knight and an attorney for Defendants in this action.

3.      Defendant Football Northwest LLC d/b/a Seattle Seahawks has asked Plaintiff to stipulate to transfer venue of this action from the Southern District of Texas to the Western District of Washington, and they have refused.

4.      Texas A&M gave no warning that it planned to sue the Seahawks and seek an *ex parte* TRO.  At Texas A&M's request, the Seahawks have agreed on three occasions to extend the Plaintiff's Temporary Restraining Order to facilitate discussions about a possible agreed

temporary injunction and to accommodate Texas A&M's counsel's change of law firms. These extensions have been without waiver of any of the Seahawks' objections to the issuance or scope of the TRO.

5.      Attached as **Exhibit A** is a true and correct copy of Texas A&M's Petition, Jury Demand and Application for Temporary Restraining Order and Temporary and Permanent Injunctions filed in the District Court of Brazos County on January 30, 2006.

6.      Attached as **Exhibit B** are true and correct copies of "Judicial Caseload Statistics" for the Southern District of Texas and the Western District of Washington downloaded from www.uscourts.gov.

_____
J. Michael Bell

SUBSCRIBED AND SWORN to before me this 22 day of  March , 2006.



_____
(Signature of Notary)


_____
Notary public in and for the State of
Texas, residing at _____
My appointment expires: _____

JEANETTE SHELTON
Notary Public, State of Texas
My Commission Expires
March 31, 2009

# EXHIBIT A

CAUSE NO. _06-000231-CV-85_

| | | |
|---|---|---|
| **TEXAS A&M UNIVERSITY** | § | IN THE DISTRICT COURT |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | OF BRAZOS COUNTY, TEXAS |
| **SEATTLE SEAHAWKS, INC.,** | § | |
| **SEATTLE PROFESSIONAL** | § | |
| **FOOTBALL, INC., and FOOTBALL** | § | |
| **NORTHWEST, LLC** | § | |
| | § | _____ JUDICIAL DISTRICT |
| **Defendants.** | § | |



**FILED**
DC _____ o'clock ___ M
JAN 3 0 2006
MARC HAMLIN, DIST CLERK
Brazos County, Texas
By _____ Deputy

## PLAINTIFF'S ORIGINAL PETITION, JURY DEMAND, AND APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY AND PERMANENT INJUNCTIONS

Plaintiff Texas A&M University ("Texas A&M") files this Original Petition, Jury Demand, and Application for Temporary Restraining Order and Temporary and Permanent Injunctions ("Petition") against Seattle Seahawks, Inc., Seattle Professional Football, Inc., and Football Northwest, LLC (collectively referred to as "Defendants" or "the Seattle Seahawks"), and would respectfully show the Court as follows:

**EXHIBIT A**

### I.

### PRELIMINARY STATEMENT

1.      Texas A&M is a university rooted in tradition, honor, and pride. Dating back to January 2, 1922, the "12TH MAN" is one of the most revered, inviolate, and time-honored Texas A&M traditions. Through Texas A&M's continuous use of the "12TH MAN" for over eighty (80) years, Texas A&M has acquired common law trademark rights to this mark on a variety of goods and services including towels, flags, shirts, buttons, and other assorted merchandise. As further evidence of trademark rights to the "12TH MAN," the United States Patent and Trademark Office

granted three trademarks to Texas A&M for its world-renowned marks, "12TH MAN," Registration Nos. 1,948,306 and 1,612,053, and "12TH MANIA!," Registration No. 2,189,229, covering a variety of goods and services, including towels, flags, clothing, and other assorted merchandise. Both the common law and federal trademarks (collectively referred to as Texas A&M's "12TH MAN" marks) give Texas A&M the exclusive right to sell, offer to sell, advertise, announce, promote, distribute, market, and use Texas A&M's "12TH MAN" marks.

2.    The Seattle Seahawks stole Texas A&M's "12TH MAN" marks and are intentionally and willfully infringing Texas A&M's "12TH MAN" trademarks by distributing, marketing, advertising, selling, and promoting merchandise emblazoned with Texas A&M's "12TH MAN" marks. Interestingly, the Seattle Seahawks' infringing use of Texas A&M's "12TH MAN" marks coincided with the arrival of Mike Clark, the Seattle Seahawks' strength and conditioning coach who was formerly employed as a coach at Texas A&M, and Rocky Bernard, the Seattle Seahawk defensive lineman who played football at Texas A&M.

3.    Furthermore, the Seattle Seahawks' use of Texas A&M's famous "12TH MAN" and "12TH MANIA!" marks without authorization dilutes the distinctive quality of and tarnishes the public image of "12TH MAN" and "12TH MANIA!," thereby harming Texas A&M's reputation.

4.    Despite repeated requests by Texas A&M that the Seattle Seahawks cease and desist using Texas A&M's "12TH MAN" marks, the Seattle Seahawks refuse to do so. Now, on the eve of the Super Bowl, the Seattle Seahawks continue: (1) to intentionally and willfully display infringing flags, notably one from the top of the world famous Seattle Space Needle, bearing Texas A&M's "12TH MAN" marks; and (2) to intentionally and willfully distribute, market, advertise, sale, and promote infringing merchandise (e.g., towels, shirts, flags, buttons, and other assorted merchandise) bearing Texas A&M's "12TH MAN" marks.

5.   Texas A&M files this lawsuit to protect its famous "12TH MAN" marks and respectfully requests this Court prevent the Seattle Seahawks (and anyone in privity with the Seattle Seahawks) from marketing, selling, offering for sale, distributing, advertising, using as promotional material, announcing, and/or performing any other act that uses Texas A&M's "12TH MAN" marks or any colorable imitation thereof. Texas A&M respectfully requests a Temporary Restraining Order and preliminary and permanent injunctive relief because Texas A&M faces irreparable harm with an audience of over one (1) billion people worldwide scheduled to watch the Super Bowl. The dilution and harm to Texas A&M's "12TH MAN" marks during the Super Bowl alone would be catastrophic and immeasurable economically.

## II.

## DISCOVERY CONTROL PLAN

6.   Plaintiff asserts that discovery in this case should be conducted under Level Two (2) of the Discovery Control Plan pursuant to Rule 190.3 of the Texas Rules of Civil Procedure.

## III.

## PARTIES

A.   **Plaintiff**

7.   Plaintiff Texas A&M University is a public university located in Brazos County, College Station, Texas, 77843. Through Texas A&M's continuous use of the "12TH MAN" for over eighty (80) years, Texas A&M has acquired common law trademark rights to the "12TH MAN" mark on a variety of goods and services including towels, flags, shirts, buttons, and other assorted merchandise. The United States Patent and Trademark Office granted three trademarks to Texas A&M for its world-renowned marks, "12TH MAN," Reg. Nos. 1,948,306 and 1,612,053, and "12TH MANIA!," Reg. No. 2,189,229, covering a variety of goods and services, including towels, flags, shirts, buttons, drinking containers, jewelry, and other assorted

PLAINTIFF'S ORIGINAL PETITION, JURY DEMAND, AND APPLICATION FOR TEMPORARY
RESTRAINING ORDER AND TEMPORARY AND PERMANENT INJUNCTIONS            Page 3

merchandise. Both the common law and federal trademarks (collectively referred to as Texas A&M's "12TH MAN" marks) give Texas A&M the exclusive right to sell, offer to sell, advertise, announce, promote, distribute, market, and use Texas A&M's "12TH MAN" marks.

**B.    Defendants**

8.    Defendant Seattle Seahawks, Inc., is a Washington corporation with its principal place of business located at 11220 NE 53rd Street, Kirkland, WA, 98033. Seattle Seahawks, Inc. is a non-resident of the State of Texas and is engaged in business in the State of Texas by selling (and offering for sale) products to Texas residents in Texas. Further, the Seattle Seahawks engage in activities in the State of Texas. Seattle Seahawks, Inc. does not maintain a place of regular business in Texas or a registered agent upon whom service may be affected. Based on the foregoing, Seattle Seahawks, Inc. may be served with process in accordance with Texas Civil Practice and Remedies Code § 17.044 by serving the Secretary of State as agent for process for Seattle Seahawks, Inc. and to be forwarded by the Secretary of State to its Vice President Lance Lopes at his regular business address at 11220 NE 53rd Street, Kirkland, WA, 98033-7505.

9.    Defendant Seattle Professional Football, Inc., is a Washington corporation with its principal place of business located at 11220 NE 53rd Street, Kirkland, WA, 98033. Seattle Professional Football, Inc. is a non-resident of the State of Texas and is engaged in business in the State of Texas by selling (and offering for sale) products to Texas residents in Texas. Further, the Seattle Professional Football, Inc. engages in activities in the State of Texas. Seattle Professional Football, Inc. does not maintain a place of regular business in Texas or a registered agent upon whom service may be affected. Based on the foregoing, Seattle Professional Football, Inc. may be served with process in accordance with Texas Civil Practice and Remedies Code § 17.044 by serving the Secretary of State as agent for process for Seattle Professional Football, Inc. and to be forwarded by the Secretary of State to its President Bob Whitsett at his

regular business address at 11220 NE 53rd Street, Kirkland, WA, 98033-7505.

10.    Defendant Football Northwest, LLC, is a Washington corporation with its principal place of business located at 11220 NE 53rd Street, Kirkland, WA, 98033. Football Northwest, LLC, is a non-resident of the State of Texas and is engaged in business in the State of Texas by selling (and offering for sale) products to Texas residents in Texas. Further, Football Northwest, LLC engages in activities in the State of Texas. Football Northwest, LLC, does not maintain a place of regular business in Texas or a registered agent upon whom service may be affected. Based on the foregoing, Football Northwest, LLC, may be served with process in accordance with Texas Civil Practice and Remedies Code § 17.044 by serving the Secretary of State as agent for process for Football Northwest, LLC, and to be forwarded by the Secretary of State to its Registered Agent Lance Lopes at his regular business address at 11220 NE 53rd Street, Kirkland, WA, 98033-7505.

**IV.**

**JURISDICTION & VENUE**

11.    This is an action for federal trademark infringement, federal dilution, Texas state law dilution, and common law trademark infringement. This Honorable Court has jurisdiction over this case in that it contains a request for the recovery of damages which are within the jurisdictional limits of this Court.

12.    Pursuant to Section 15.002(a)(4) of the Texas Civil Practice and Remedies Code, venue is proper in Brazos County, Texas, because Texas A&M is located in Brazos County, Texas, and subdivisions (1), (2), and (3) do not apply to this lawsuit.

## V.

### FACTUAL BACKGROUND

A.    The Origins of Texas A&M's "12TH MAN."

13.    Texas A&M is a university rooted in tradition, honor, and pride.  Perhaps one of the most revered, inviolate, and time-honored traditions is that of the "12TH MAN."  Most graduates of Texas A&M can tell the story of the "12TH MAN" as is set forth in the Affidavit of Mike Huddleston, attached hereto as Exhibit 1 and incorporated herein for all purposes. (Huddleston Aff., ¶¶ 3-4).

14.    The tradition of the "12TH MAN" was born on January 2, 1922, when an underdog Texas A&M team was playing Centre College, then the nation's top ranked football team.  As the hard fought game wore on, and Texas A&M dug deeply into their limited reserves, Coach Dana X. Bible remembered a member of the football squad who was not in uniform.  This "12TH MAN" was in the press box during the game helping reporters identify the Texas A&M football players.  (Huddleston Aff., ¶ 4).

15.    The name of the "12TH MAN" was E. King Gill ("Gill"), and he was a former football player who was currently only playing basketball.  Gill was called in from the stands, suited up, and stood ready throughout the rest of the football game against Centre College, which Texas A&M finally won 22-14.  (Huddleston Aff., ¶ 4).

16.    When the game ended, Gill was the only man left standing on the sidelines for Texas A&M.  Gill later said, "I wish I could say that I went in and ran for the winning touchdown, but I did not.  I simply stood by in case my team needed me."

17.    Gill's gesture was more than enough for the Texas A&M football team.  Although Gill did not play in the game, he had accepted the call to help his team.  Gill came to be thought

of as the "12TH MAN" because he stood ready for duty in the event that the eleven Texas A&M football players on the gridiron needed assistance. (Huddleston Aff., ¶ 4).

18.     That spirit of readiness for service, desire to support, and enthusiasm helped kindle a flame of devotion among the entire student body; a spirit that has grown vigorously throughout the years. The entire student body at Texas A&M is "12TH MAN," and they stand during the entire Texas A&M football game to show their support. The "12TH MAN" is always in the stands waiting to be called upon if they are needed. (Huddleston Aff., ¶ 4).

19.     This tradition took on a new look in the 1980s when Coach Jackie Sherrill started The "12TH MAN" Kick-Off Team composed of regular students through open tryouts. This "12TH MAN" team performed very well and held opponents to one of the lowest yards per return averages in the league.

20.     Later, Coach R.C. Slocum changed the team to allow only one representative of the "12TH MAN" team to perform the kick-off.

**B.     Texas A&M Trademark Rights to "12TH MAN" and "12TH MANIA" Marks.**

21.     Through Texas A&M's continuous use of the "12TH MAN" for over eighty (80) years, Texas A&M has acquired common law trademark rights to this mark on a variety of goods and services including towels, flags, shirts, buttons, and other assorted merchandise.

22.     The Patent and Trademark Office also granted three trademarks to Texas A&M for its world-renowned marks, "12TH MAN," Registration Nos. 1,948,306 and 1,612,053, and "12TH MANIA!," Registration No. 2,189,229, covering a variety of goods and services, including towels, flags, shirts, buttons, and other assorted merchandise. (Huddleston Aff., ¶¶ 5-7).

23.    Both the common law and federal trademarks give Texas A&M the exclusive right to sell, offer to sell, advertise, announce, promote, distribute, market, and use Texas A&M's "12TH MAN" marks.

C.    **The Seattle Seahawks Intentionally Infringe Texas A&M's "12TH MAN" Marks.**

24.    The Seattle Seahawks have been using Texas A&M's "12TH MAN" marks in advertisements, on their website, and on merchandise including shirts, towels, buttons, jerseys, and flags. The Seattle Seahawks are advertising the "12TH MAN" marks on their website with at least twenty-five (25) references to the "12TH MAN" marks, and the Seattle Seahawks' pro shop sells merchandise bearing the "12TH MAN" marks.    The extent of their infringement was summarized in an article by the Fort Worth Star Telegram, a true and correct copy of which is attached hereto as Exhibit 2.

25.    The Seattle Seahawks raised "12TH MAN" flags on national television at their football games and at ceremonies placing a "12TH MAN" flag atop the world famous Seattle Space Needle. A "12TH MAN" flag also waives atop the Seattle Seahawks' stadium. (Huddleston Aff., ¶ 8; Exhibit 3).    The Seattle Seahawks distributed "12TH MAN" towels to the people attending the NFC Championship Football game held on January 23, 2006. (Huddleston Aff., ¶ 8; Exhibit 4).    The Seattle Seahawks have also distributed "12TH MAN" buttons during the NFC Divisional playoff game held on January 16, 2006. (Huddleston Aff., ¶ 8; Exhibit 5).

26.    The website of the Seattle Seahawks' booster club offers "12TH MAN" wallpaper for computers.  (Exhibit 2).  Other merchandise being sold bearing the "12TH MAN" on internet websites include shirts, bags, jerseys, pins, pendants, buttons, towels, and even stuffed dolls. (Exhibit 6).  There is no question that this infringement by the Seattle Seahawks is increasing and is diluting Texas A&M's "12TH MAN" marks.

27.     Further, this infringement of Texas A&M's "12TH MAN" marks by the Seattle Seahawks is willful and intentional.  Texas A&M sent cease and desist letters to the Seattle Seahawks beginning in 2004, and the Seattle Seahawks responded and acknowledged that Texas A&M has a registered trademark and offered to remove the references to the "12TH MAN" marks from their website and from their magazines. (Huddleston Aff., ¶¶ 9-10).

28.     The Seattle Seahawks use of the "12TH MAN" marks remain, and as stated above, have only increased with merchandise being sold nationwide for the upcoming Super Bowl.  As late as November 7, 2005, the Seattle Seahawks sent correspondence to Texas A&M again acknowledging Texas A&M's "12TH MAN" trademarks and Texas A&M's "desire to preserve its rights in its trademark" and stated that they would not use the term with the sale of any merchandise. (Huddleston Aff., ¶ 10).

29.     The Seattle Seahawks have only provided empty promises to stop the use, and they have actually increased their infringing uses of Texas A&M's "12TH MAN" marks.  There will be more and more use of Texas A&M's "12TH MAN" marks with the upcoming SuperBowl game, with millions of products infringing on Texas A&M's "12TH MAN" marks being sold and with over a billion viewers watching the improper use and dilution of Texas A&M's "12TH MAN" marks at the Super Bowl.  It is clear that unless the Seattle Seahawks are restrained from further use of Texas A&M's "12TH MAN" marks, Texas A&M will suffer irreparable harm.

## VI.

## CLAIMS

**A.    Common-Law Trademark Infringement**

30.     Texas A&M repeats and realleges paragraphs 1 through 29 above, as though fully set forth herein.

31. Through Texas A&M's continuous use of the "12TH MAN" for over eighty (80) years, Texas A&M has acquired common law trademark rights to this mark on a variety of goods and services including towels, flags, shirts, buttons, and other assorted merchandise.

32. The common-law "12TH MAN" mark is highly distinctive and well-known, and the nation and the world have come to know and associate the "12TH MAN" mark with Texas A&M and its products.

33. Defendant, the Seattle Seahawks, without authorization from Texas A&M, is using Texas A&M's "12TH MAN" marks in commerce: (1) to intentionally and willfully display infringing flags, notably one from the top of the world famous Seattle Space Needle; and (2) to intentionally and willfully distribute, market, advertise, announce, and promote infringing merchandise (e.g., towels, shirts, flags, buttons, and other assorted merchandise) bearing Texas A&M's "12TH MAN" marks.

34. Defendant's use of the mark is deceptive to consumers and patrons of Texas A&M, falsely implying a connection between Defendant and Texas A&M. Defendant's action is likely to cause confusion, mistake, or deception as to the source of sponsorship of Defendant's goods or services as to a connection between the parties.

35. Defendant's infringing conduct is deliberate and is undertaken with knowledge of Texas A&M's prior rights in the "12TH MAN" marks.

36. The aforesaid conduct is causing Texas A&M irreparable harm for which there is no adequate remedy at law and, unless restrained, will continue to cause irreparable harm.

**B.   Texas State Law Trademark Dilution**

37. Texas A&M repeats and realleges paragraphs 1 through 36 above, as though fully set forth herein.

38. Texas Business & Commerce Code § 16.29 provides that "[a] person may bring

an action to enjoin an act likely to injure a business reputation or to dilute the distinctive quality of a mark registered under this chapter or Title 15, U.S.C., or a mark or trade name valid at common law, regardless of whether there is competition between the parties or confusion as to the source of goods or services. An injunction sought under this section *shall be obtained* pursuant to Rule 680 et seq. of the Texas Rules of Civil Procedure."

39.    Defendant has diluted Texas A&M's "12TH MAN" marks through their intentional and willful infringing use. Texas A&M is the owner of the famous "12TH MAN" marks. Defendant's intentional use of Texas A&M's "12TH MAN" marks has diluted the "12TH MAN" marks, causing Texas A&M injury.

**C.    Federal Trademark Infringement**

40.    Texas A&M repeats and realleges paragraphs 1 through 39 above, as though fully set forth herein.

41.    Texas A&M owns the right to license the "12TH MAN" marks. The United State Patent and Trademark Office granted three trademarks to Texas A&M for its world-renowned marks, "12TH MAN," Registration Nos. 1,948,306 and 1,612,053, and "12TH MANIA!," Registration No. 2,189,229, for goods and services described herein.

42.    Since registering its trademarks in the United States Patent & Trademark Office, Texas A&M has consistently used the registered notice symbol "(R)" in association with its products.

43.    Texas A&M has continually engaged in business using the "12TH MAN" trademarks in commerce since November 1984 in connection with towels. Moreover, the mark "12TH MAN" has been used in connection with other goods and services since September 1983, and the mark "12TH MAN" has been used since 1922. Texas A&M federal trademark registrations are incontestable pursuant to 15 U.S.C. § 1065.

44.    Texas A&M has continually engaged in business using the "12TH MANIA!" trademarks in interstate commerce since August 1996 in connection with goods and services, and the mark "12TH MANIA" has been used since 1996.

45.    Texas A&M has never given the Seattle Seahawks consent to use the marks "12TH MAN," "12TH MANIA!," or any other Texas A&M trademark in any manner or form.

46.    By continuing to market, advertise, produce, sell, and distribute new products containing Texas A&M's "12TH MAN" marks, the Seattle Seahawks are engaged in commerce. The Seattle Seahawk's continuing use of the "12TH MAN" and "12TH MANIA!" marks, in producing and selling and/or distributing towels, flags, shirts, buttons, and other products constitutes a reproduction, counterfeit, copy or colorable imitation of Texas A&M's trademarks in connection with the sale, distribution, or advertising of goods and services.

47.    The Seattle Seahawks are using the "12TH MAN" and "12TH MANIA!" marks in such a way as to be likely to cause confusion or to cause mistake or to deceive consumers as to the identity, source, origin, or sponsorship of the Seattle Seahawks' goods or services. The Seattle Seahawks' continued use of the "12TH MAN" and "12TH MANIA!" marks is done with the intention of deceiving and misleading the public at large and of wrongfully trading on the goodwill and reputation of Texas A&M in violation of section 32 of the Lanham Act, 15 U.S.C. § 1114.

48.    Furthermore, as a result of the acts of the Seattle Seahawks alleged herein, Texas A&M is entitled to an injunction and other equitable relief as set forth below.

49.    As a result of the Seattle Seahawks' willful and intentional acts alleged herein, Texas A&M has been damaged in an amount to be proven at trial, including actual damages, treble damages, costs of this action, and reasonable attorneys' fees.

### D.    Federal Trademark Dilution

50.    Texas A&M repeats and realleges paragraphs 1 through 49 above, as though fully set forth herein.

51.    Texas A&M's "12TH MAN" and "12TH MANIA!," federal trademarks are famous and distinctive.

52.    The Seattle Seahawks' use of Texas A&M's "12TH MAN" marks have been for the Seattle Seahawks own improper commercial gain. The Seattle Seahawks' use of Texas A&M's "12TH MAN" marks without authorization dilutes the distinctive quality of and tarnishes the public image of "12TH MAN" marks and harms Texas A&M's reputation.    The Seattle Seahawks willfully and intentionally trades on, dilutes, and tarnishes Texas A&M's "12TH MAN" marks and Texas A&M's reputation, in violation of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c).

53.    Texas A&M has been injured by the Seattle Seahawks wrongful conduct and is therefore entitled to relief, including without limitation damages, treble damages, costs, and injunctive relief, as set forth below.

### E.    Application For Injunctive Relief

#### 1.    Temporary Restraining Order

54.    Texas A&M repeats and realleges paragraphs 1 through 53 above, as though fully set forth herein.

55.    The Seattle Seahawks refuse to cease and desist using Texas A&M's "12TH MAN" marks and continue to distribute, display, and merchandise goods bearing Texas A&M's "12TH MAN" marks.

56.    In order to prohibit and prevent injury to Texas A&M's business reputation and dilution of the distinct quality of Texas A&M's "12TH MAN" marks, Texas A&M seeks a

Temporary Restraining Order enjoining the Seattle Seahawks, their agents, servants, employees and representatives and all other persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise from using, selling, offering for sale, disseminating, distributing, issuing, promoting, announcing, marketing, or advertising any products, goods or services which relate in any way to Texas A&M's "12TH MAN" marks and from engaging in any activity connected with Texas A&M's "12TH MAN" marks.

### 2.    Temporary Injunction

57.    Texas A&M repeats and realleges paragraphs 1 through 56 above, as though fully set forth herein.

58.    Texas A&M seeks a Temporary Injunction extending the effect of the Temporary Restraining Order until a judgment is entered herein.

### 3.    Permanent Injunction

59.    Texas A&M repeats and realleges paragraphs 1 through 58 above, as though fully set forth herein.

60.    Texas A&M seeks a Permanent Injunction following a trial hereof extending the effect of the Temporary Injunction requested herein.

61.    Absent injunctive relief, the Seattle Seahawks will continue to use Texas A&M's "12TH MAN" marks in connection with their goods and services which will injure Texas A&M's reputation, dilute the distinctiveness of Texas A&M's "12TH MAN" marks and cause confusion as to the source of the goods or services. Texas A&M does not have an adequate remedy at law to recover the damages caused by the unauthorized use of Texas A&M's "12TH MAN" marks.

**F.    CONDITIONS PRECEDENT**

62.    All conditions precedent to the relief requested by Texas A&M herein have occurred or have been performed.

## VII.

### JURY DEMAND

63.    Texas A&M hereby requests a jury trial on all issues and claims.

## VIII.

### REQUEST FOR RELIEF

WHEREFORE, Texas A&M prays that it be awarded relief as follows:

1.    A temporary restraining order and preliminary and permanent injunction ordering the Seattle Seahawks, their agents, servants, employees and representatives and all other persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise from using, selling, offering for sale, disseminating, distributing, issuing, promoting, announcing, marketing, or advertising any products, goods or services which relate in any way to Texas A&M's "12TH MAN" marks and from engaging in any activity connected with Texas A&M's "12TH MAN" marks;

2.    Damages as prayed for herein;

3.    Reasonable attorneys' fees and costs incurred in litigating this action;

4.    Pre-judgment and post-judgment interest at the maximum legal rate; and

5.    All other relief to which Texas A&M may be justly entitled.

Respectfully,

WINSTEAD SECHREST & MINICK P.C.

SANFORD E. WARREN, JR.
Texas Bar No. 20888690
MIKE BAGGETT
Texas State Bar No. 01511300
R. SCOTT RHOADES
Texas Bar No. 90001757
TANYA D. HENDERSON
Texas Bar No. 50511706
JENNIFER L. MURPHY
Texas Bar No. 24027560

5400 Renaissance Tower
1201 Elm Street
Dallas, TX 75270-2199
Telephone: (214) 754-5400
Fax: (214) 745-5390

BILL YOUNGKIN
State Bar No. 22226500
Post Office Box 4806
Bryan, TX 77805
Telephone: (979) 260-7030
Fax: (979) 268-3037

**ATTORNEYS FOR PLAINTIFF**